# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| LITA FILIPPO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:05 CV 64 |
| | ) | |
| LEE PUBLICATIONS, INC., | ) | |
| a subsidiary of Lee Enterprises, | ) | |
| d/b/a *THE TIMES*, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the court on defendant's motion for summary judgment (docket # 33), motion to strike (docket # 48), and motion for oral argument (docket # 36). For the reasons set forth below, the motion for summary judgment is granted. Both the motion to strike and the motion for oral argument are denied as moot.

## I. BACKGROUND

Between January and August of 2003, defendant Lee Publications, Inc., publisher of the Northwest Indiana newspaper *The Times*, printed news articles, editorial opinions, and cartoons involving plaintiff Lita Filippo. Plaintiff is a resident of Lake County, Indiana, who works in insurance sales. When the publications appeared in *The Times,* plaintiff served as vice-chairman of the Partnership for a Drug-Free Lake County ("the Partnership"), the local arm of the Governor's Commission for a Drug-Free Indiana. The Partnership was funded, in part, by fees assessed on residents convicted of drug and alcohol violations. The Partnership's activities included "Red Ribbon"

programs that involved presentations, contests, and rallies for local children in an effort to educate them about the dangers of drug and alcohol abuse. Plaintiff's position on the Partnership board was unpaid, and she served on a volunteer basis.

On January 25, 2003, Timothy Gardenhire, an officer of the St. John Police Department who was participating in the Lake County Drunk Driving Task Force, pulled plaintiff over after noticing plaintiff's vehicle speeding and weaving. Plaintiff initially told Officer Gardenhire that she had not been drinking, but then admitted that she had one glass of wine. According to the incident report, plaintiff's speech was slurred, her eyes were bloodshot and watery, her face was flushed and red, and there was a strong odor of alcohol on plaintiff's breath. The report also indicated that plaintiff asked Officer Gardenhire not to arrest her because she was simply trying to follow her friend home. Officer Gardenhire arrested her after she refused to take a breath test. Officer Gardenhire's report states that plaintiff was yelling, crying, and uncooperative and told Officer Gardenhire that her arrest would cost him his job. Plaintiff maintains that she did not behave in such a manner. She also attests that the arrest was a "set up" and that the strong smell of alcohol eminating from her vehicle on the night of her arrest was from a drink that was spilled on her at the party she had attended that evening. (Filippo Dep. 138-40.) Plaintiff was released from custody early the next morning. The charges against plaintiff were later dropped.

The first article related to plaintiff's arrest appeared in *The Times* on January 28, 2003, a few days after the arrest took place. The article stated that plaintiff, a community

anti-drug and alcohol activist, was arrested for drunk driving. Officer Gardenhire was quoted as stating that plaintiff was "the most obnoxious drunken female I have ever arrested." (Def.'s Ex. 9.) In February of the same year, *The Times* published additional articles about plaintiff, drawing a parallel between plaintiff's purported behavior during her drunk driving arrest and an incident that occurred in May of 2002 when plaintiff allegedly tried to board a riverboat during a non-boarding time and behaved contentiously when Jennifer McDonald, an Indiana State Trooper, intervened. In July, an additional editorial article and cartoon appeared in *The Times*, calling for plaintiff's resignation from the Partnership board and suggesting that plaintiff drop the defamation lawsuit she had filed against the agencies involved in her drunk driving arrest. The cartoon depicted Filippo next to O.J. Simpson; Filippo wore a button reading: "Just say whatever to drinking and driving."[1]

Plaintiff alleges that these publications defamed her by placing her in a false, damaging, and negative light. Plaintiff further alleges that her insurance business suffered because of the publicity and that jail inmates sent her harassing letters after reading the articles. Defendant seeks summary judgment, arguing that some of the

---

[1] *The Times* also published a number of articles in April and August of 2003 related to the local struggle between two groups (one being the Partnership) over control of anti-drug and alcohol education funding in the county. The details of this news coverage is largely irrelevant to resolving the present motion, because, as explained below, plaintiff's response brief does not address how these articles defame her.

publications constitute opinions protected by the First Amendment and that plaintiff does not have sufficient evidence that the articles were published with actual malice.

## II. LEGAL STANDARD

Summary judgment, a mechanism rooted in FEDERAL RULE OF CIVIL PROCEDURE 56, is "an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986) (internal quotation marks omitted). When considering a motion for summary judgment, the court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in his favor. *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 443 (7th Cir. 1994). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986); *Doe,* 42 F.3d at 443.

The party seeking summary judgment, the movant, bears the initial responsibility of informing the court of the basis for his motion and identifying the portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. "[T]he burden on the moving party may be discharged by 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Once the moving part has met his burden, the non-moving party must identify specific facts establishing that there is a genuine issue of fact for trial. *Anderson,* 477 U.S. at 252; *Palmer v. Marion County,* 327

F.3d 588, 595 (7th Cir. 2003) (citing *Celotex,* 477 U.S. at 324). In doing so, the non-moving party cannot rest on the pleadings alone, but must present fresh proof in support of its position. *Anderson,* 477 U.S. at 248; *Donovan v. City of Milwaukee,* 17 F.3d 944, 947 (7th Cir. 1994). The non-movant must do more than raise some metaphysical doubt as to the material facts; he must come forward with specific facts showing a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

## III. DISCUSSION

### A. Abandoned claims

Defendant's motion seeks summary judgment as to plaintiff's defamation claim regarding nine articles, editorials, and cartoons published by *The Times*. Plaintiff's response does not address three of these articles and one cartoon. Claims not addressed in a response to a motion for summary judgment are considered abandoned. *White v. Gerardot,* No. 1:05-CV-382, 2007 WL 541819, at *4 (N.D. Ind. Feb. 15, 2007); *Zimmer Tech., Inc. v. Howmedica Osteonics Corp.,* No. 3:02-CV-425 AS, 2007 WL 603043, at *8 (N.D. Ind. Feb. 22, 2007); *see Palmer,* 327 F.3d at 597-99. Therefore, defendant's motion for summary judgment is granted to the extent that plaintiff's complaint alleges that she was defamed by the articles and/or cartoons appearing in the *The Times* on April 11, April 15, August 4, and August 28, 2003. For the same reason, summary judgment is also granted in defendant's favor as to any tort that might be implicated by plaintiff's allegations of "invasion of privacy." (*See* Def.'s Memo. 27.)

### B. Qualified privilege (the "actual malice" standard)

The critical threshold issue is whether the "actual malice" standard first delineated in the landmark Supreme Court decision *New York Times Co. v. Sullivan,* 376 U.S. 25 (1964), applies with respect to any or all of the publications at issue in this case. In *New York Times*, the Court held that the First Amendment requires that a defamation plaintiff prove that a defendant acted not merely negligently but with "actual malice" when the alleged victim of defamation is a public official. The Court later held that the actual malice test also applies when the alleged victim is a public figure. *Curtis Pub. Co. v Butts,* 388 U.S. 130, 155 (1967).

After *New York Times* and *Curtis,* it was clear that the First Amendment of the United States Constitution would not protect a publisher by imposing the actual malice requirement on a *private* citizen bringing a defamation suit. However, the Court left the door open for states to afford publishers extra protection beyond that provided by the First Amendment. *Gertz v. Robert Welch Inc.,* 418 U.S. 323, 347 (1974) ("the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual"); *Jean v. Dugan,* 20 F.3d 255, 262 (7th Cir. 1994) ("it is perfectly appropriate for the states to give speakers greater protection than the United States Constitution requires"). In *Journal-Gazette Co., Inc. v. Bandido's, Inc.,* the Indiana Supreme Court did exactly that by holding that if a defendant's speech relates to a matter of public concern or interest, then the speech is qualifiedly privileged and the plaintiff must establish that the defendant speaker acted

6

with "actual malice," *even if the plaintiff is a private individual*. 712 N.E.2d 446, 452 (Ind. 1999) (expressly adopting *Aafco Heater & Air Conditioning Co. v. Nw. Pubs., Inc.* 321 N.E.2d 580 (Ind. Ct. App. 1974)). The court stated: "'If a matter is subject [sic] of public or general interest, it cannot suddenly become less so merely because a private individual is involved, or because in some sense the individual did not "voluntarily" choose to become involved.'" *Id.* (quoting *Aafco,* 321 N.E.2d at 586-87 (quoting *Rosenbloom v. Metromedia Inc.,* 403 U.S. 29, 43 (1971))).

In this case, plaintiff argues that she is nothing more than a private citizen, and that the actual malice standard should not apply, citing the fact that she was an unpaid, volunteer member of the Partnership. (Pl.'s Resp. 2.) Defendant argues that plaintiff was actively involved in community affairs and should be considered a public figure and/or official. (Def.'s Memo. 7 n.4, 7-9.) Defendant also contends that plaintiff's drunk driving arrest and involvement in the Partnership are both matters of public concern. (Def.'s Memo. 9-10.)

Whether a matter is of public concern or interest is a decision for the trial court. *Aafco,* 321 N.E.2d at 590; *Fazekas v. Crain Consumer Group Div. of Crane Comms., Inc.,* 583 F. Supp. 110, 114 (S.D. Ind. 1984). "A matter of general or public interest is one in which '(t)he public's primary interest is in the event; the public focus is on the conduct of the participant and the content, effect, and significance of the conduct.'" *Fazekas,* 583 F. Supp. at 114 (quoting *Rosenbloom,* 403 U.S. at 43). In Indiana, "the public interest is necessarily broad," and cases dealing with the law of that state reveal a "panoply of

7

topics within the scope of 'public interest.'" *Moore v. Univ. of Notre Dame,* 968 F. Supp. 1330, 1338 n.11 (N.D. Ind. 1997).

Courts interpreting Indiana law have found that the public has an interest in matters involving the leadership and control of entities serving the community, such as the management of a public sewer plant, *St. John v. Town of Elletsville,* 46 F. Supp. 2d 834, 849 (S.D. Ind. 1999); and control of a television broadcasting channel, *Woods v. Evansville Press Co., Inc.,* 791 F.2d 480, 483 (7th Cir. 1986). Courts have also held that issues related to public safety and well-being are matters of public concern, such as a fatal residential fire and its possible causes, *Aafco,* 321 N.E.2d at 673; and an arrest based on misconduct in a public park, *Davis v. City of Greenwood,* No. IP 00-0527-C-M/S, 2000 WL 33309816, at *12 (S.D. Ind. Nov. 17, 2000). More lighthearted matters have even made the cut, including stock car racing scandals, *Fazekas,* 583 F. Supp. at 114; and college football, *Moore,* 968 F. Supp. at 1338 ("[I]t is this court's opinion that football, and specifically Notre Dame football, is a matter of public interest.").

Like local management of public sewer systems and television channels, the leadership of local drug and alcohol education efforts is of public interest to the Lake County community. This is particularly the case because the Partnership deals with local youth. *See Terry v. Davis Cmty. Church,* 131 Cal. App. 4th 1534, 1547 (Cal. App. 2005) (youth group leaders' alleged misconduct was matter of public concern because public has interest in matters affecting its youth); *Mcintire v. Piscottano,* No. CV010076151, 2005 WL 1670594, at *2 (Conn. Super. May 23, 2005) (same, alleged

8

misconduct of teacher). For this reason, plaintiff's claims regarding news and editorial items related to her involvement with the Partnership and her qualifications for serving on the Partnership board are subject to the "actual malice" test under *Journal-Gazette*.

Further, if college football and stock car racing have been labeled "matters of public interest," it seems clearly appropriate to apply the concept to something as grim and potentially perilous to the community as drunk driving. *See Lee v. City of Rochester*, 195 A.D.2d 1000, 1001 (N.Y. App. Div. 1993) (drunk driving incident constituted matter of public concern). Like residential fires and criminal activity in public parks, drunk driving affects the safety of the public at large and has the potential to produce disastrous effects. The "public interest" label seems especially appropriate as applied to the drunk driving arrest at issue in this case, because it involved a vice-chairman of a county-funded organization entrusted with the duty of educating youth about the dangers of drug and alcohol abuse. Therefore, news items regarding plaintiff's drunk driving arrest also relate to matters of public interest invoking *Journal-Gazette's* "actual malice" standard.

### C. The Times' publications

#### 1. January 28, 2003, article

The court begins with the first, and perhaps the most hotly disputed, publication at issue in this case: the January 28, 2003, article reporting on plaintiff's arrest for drinking and driving. (Def.'s Ex. 9.) The article appeared on the front page of *The Times*, with a banner headline reading: "Antidrug chief jailed on DUI charges." A subheading

9

read: "Task force officer: Lita Filippo 'is the most obnoxious drunken female I have ever arrested.'" The article reported that plaintiff, a co-director of the Partnership for a Drug-Free Lake County, was charged with driving drunk. It also summarized the police report associated with plaintiff's arrest, which stated that plaintiff tried to persuade Officer Gardenhire, the arresting officer, to let her go but became angry and abusive when she was unsuccessful. The article went on to quote Gardenhire as stating: "Between East Chicago and here, she is the most obnoxious drunken female I have ever arrested in my police career." *The Times* further reported that, according to Gardenhire, plaintiff refused a breath analysis test for alcohol, saying she did not have to because she was a leader of the Parternship. According to the article, plaintiff claimed she was "connected," told Gardenhire that the incident would cost him his job, and told booking officers that her jewelry was worth more than their salaries.

Defendant has submitted testimony from the article's author, Mark Kiesling, that he reviewed Gardenhire's incident report and plaintiff's booking sheet and interviewed the Lake County Sheriff's spokesperson before writing the article. Defendant argues that plaintiff has no evidence that defendant published the article with actual malice. In her response, plaintiff makes it clear that the only aspect of the article that she believes was defamatory was the use of Officer Gardenhire's statement that plaintiff was "the

most obnoxious drunken female I have ever arrested in my police career."[2] Plaintiff argues that the statement constitutes defamation *per se.*

"Defamation is that which tends to injure reputation or to diminish esteem, respect, good will, or confidence in the plaintiff, or to excite derogatory feelings or opinions about the plaintiff." *Lovings v. Thomas,* 805 N.E.2d 442, 447 (Ind. Ct. App. 2004). A plaintiff alleging defamation must prove four elements: (1) the existence of a communication with defamatory imputation; (2) malice; (3) publication; and (4) damages. *Trail v. Boys and Girls Clubs of Nw. Ind.,* 845 N.E.2d 130, 136 (Ind. 2006). In Indiana, "[c]ommunications are considered defamatory *per se* when they impute 1) criminal conduct; 2) a loathsome disease; 3) misconduct in a person's trade, profession, office, or occupation; or 4) or sexual misconduct to the plaintiff." *Trail,* 845 N.E.2d at 137 (quotation marks omitted).

In *Cortez v. Jo-Ann Stores, Inc.,* 827 N.E.2d 1223, 1231 (Ind. Ct. App. 2005), the court held that a statement made via e-mail that the plaintiff was "drunk"at her daughter's Girl Scout meeting was defamatory *per se* because it implied criminal behavior in the form of child neglect and public intoxication. The names of the crimes were not expressly stated in the email; the use of the term "drunk" alone was enough to implicate the crimes. *See id.* Similarly, in the case at bar, Officer Gardenhire's statement

---

[2] "The part of the January 28, 2003, article complained of in this case is *not* what is contained in the actual police report, but the published quote of the officer obtained surreptitiously by Kiesling." (Resp. 11, emphasis in original.)

that plaintiff was "drunken" during her arrest arguably implies that she was also drunk immediately preceding her arrest while she was driving, thereby committing the crime of driving under the influence of alcohol. Thus, under Indiana law, Officer Gardenhire's statement could constitute defamation *per se*.

However, even if defendant's publication of Officer Gardenhire's statement constitutes defamation *per se*, defendant is still protected by the qualified privilege set forth in *Journal-Gazette*, which requires that plaintiff present proof of actual malice in order to overcome that privilege. *Heeb v. Smith,* 613 N.E.2d 416, 419 (Ind. Ct. App. 1993) (speech was defamatory per se, but "actual malice" requirement still applied); *Henrichs v. Pivarnik ,* 588 N.E.2d 537, 542 (Ind. Ct. App. 1992) (same). Therefore, the proper focus of this inquiry is whether plaintiff has done so.

"The actual malice element required by the United States Supreme Court and our state courts is not to be confused with the ordinary definition of 'malice' as 'an evil intent or motive' arising from spite or ill will." *Shine v. Loomis,* 836 N.E.2d 952, 958 (Ind. Ct. App. 2005) (citing *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496 (1991)). "['Actual malice'] is a term of legal art that means not what it seems to mean, but that the defendant either knew that the defamatory statement . . . was false or was recklessly indifferent to whether it was true or false." *Desnick v. Am. Broad. Cos., Inc.,* 233 F.3d 514, 517 (7th Cir. 2000).

"To demonstrate reckless disregard, there must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his

publication or proof that the false publication was made with a high degree of awareness of their probable falsity." *Journal-Gazette,* 712 N.E.2d at 456 (citations and quotation and alteration marks omitted). A defendant's state of mind is crucial to this inquiry, and "is a subjective fact that may be shown by indirect or circumstantial evidence." *Poyser v. Peerless,* 775 N.E.2d 1101, 1107 (Ind. Ct. App. 2002). In the end, "[a]ctual malice must be shown by clear and convincing evidence." *Id.* "The burden of proving actual malice on the part of a defendant, which is a very difficult and demanding burden, must be shouldered entirely by the plaintiff." *Moore,* 968 F. Supp. at 1337. "The question of whether there is sufficient evidence to support finding actual malice is a question of law for the court." *Id.; Ratcliff v. Barnes,* 750 N.E.2d 433, 437 (Ind. Ct. App. 2001). When utilizing the "clear and convincing" standard, the court "must consider whether a reasonable factfinder could conclude that the plaintiff had sufficient evidence to meet that burden." *McLaughlin v. State Farm Mut. Auto. Ins. Co.,* 30 F.3d 861, 866 (7th Cir. 1994).

Plaintiff claims that Officer Gardenhire made the statement to his captain over the telephone, not realizing that Mark Kiesling (a *Times* reporter) was listening in on the captain's end of the line without disclosing his presence. According to plaintiff, the fact that this quote was "surreptitiously" obtained shows that *The Times* acted with actual malice in printing it. In support of this argument, plaintiff points out that *The Times* adheres to an ethics policy (Pl.'s Ex. B) that requires reporters to identify themselves to individuals they later quote. However, the measure of actual malice is not whether a

reporter violated a professional ethics policy. "[E]vidence of an extreme departure from professional journalistic standards, without more, cannot provide a sufficient basis for finding actual malice." *Kitco, Inc. v. Corp. for Gen. Trade,* 706 N.E.2d 581, 590 (Ind. Ct. App. 1999).

Plaintiff's only additional evidence that she claims supports a finding of actual malice regarding the January 28th article is her assertion that "obtaining a clandestine quote would cast doubt on the credibility of *the information* being received," with a citation to the deposition of William Nangle, editor of *The Times,* as support. (Pl.'s Resp. 11, emphasis in original.) Defendant challenges plaintiff's characterization of the editor's testimony. The testimony at issue reads as follows:

> Q: ... If Mr. Kiesling had not even identified himself as being on the phone during that conversation with Mr. Gardenhire, Officer Gardenhire, would that have been appropriate under this [ethics] policy?
> A: I would have had a concern about it.
> Q: And why is that?
> A: Because I think that he clearly, as it's demonstrated here, should identify himself.
> Q: If a reporter did not identify himself and was listening to a conversation surreptitiously, without the knowledge of the subject who is speaking, would that give any concern as to the credibility of the information that the reporter is receiving?
> [A:] Not necessarily. And I think there are circumstances where, again, as a part of an undercover operation, that a reporter would not necessarily identify themselves. But that would be clearly understood going into it.
> Q: But it could be a concern.
> A: It could be.
> Q: And if a reporter did such an undercover overhearing of a conversation, without the approval of the executive editor, would you believe that'd be a violation of this policy?

14

A: It could be. It would be cause for concern. Again, I stress I
don't believe that's the situation with the issue we're here for.
Q: Based on what Mr. Kiesling testified to.
A: Based on what Mr. Kiesling testified to, yes.

(Nangle Dep. 57-58.)

No reasonable fact finder would conclude that this testimony, even paired with

another reporter's alleged ethics policy violation, suffices to meet the "very difficult and

demanding burden" of proving that defendant published with actual malice. *Moore,* 968

F. Supp. at 1337. This testimony, at most, reveals Nangle's belief that there may exist

circumstances under which a surreptitiously obtained quote might cause concern about

the integrity of the information received. However, this is not clear and convincing

evidence from which a fact-finder could conclude that Nangle subjectively entertained

serious doubts *in this situation*– that is, that he possessed a "high degree" of awareness

that any false information may have been conveyed by Gardenhire's quote as published

in the January 28, 2003, article. *Journal-Gazette,* 712 N.E.2d at 456. Because plaintiff has

not presented sufficient evidence to establish actual malice with respect to *The Times'*

publication of the January 28, 2003, article regarding her arrest, her defamation claim as

to that article fails as a matter of law.

*2. February 3, 2003, article*

Plaintiff does not present any substantive legal argument as to why the February

3rd article describing her encounter with Officer McDonald at the riverboat casino

constitutes defamation. No analysis regarding the February 3rd article appears in the

legal argument section of plaintiff's brief at all. Arguably, any claim related to this

article has also been abandoned. But in order to allow plaintiff the full benefit of the doubt, the court notes that four short paragraphs in plaintiff's Statement of Genuine Issues are labeled "McDonald report and interview." (Pl.'s Resp. 4-5.) Nevertheless, to the extent that these paragraphs can be considered an argument, the argument fails.

The February 3rd article was published about a week after Filippo's arrest for drunk driving. It was preceded by the headline: "Antidrug chief has history with cops." A subheadline read: "Lita Filippo's honorary sheriff's badge yanked over '02 casino incident." The article described the incident that occurred in May of 2002 between plaintiff and Jennifer McDonald, an Indiana State Trooper. The article reported that plaintiff "tried to pass herself off as a police officer while trying to board a riverboat during non-boarding time." Officer McDonald contacted the Sheriff's Department, and was informed that plaintiff possessed an honorary badge. Officer McDonald purportedly informed *The Times* that the incident was "quite an episode," and that plaintiff argued with her for almost an hour and told McDonald that she would lose her job. Plaintiff ended up leaving without boarding the boat and without her badge, which Officer McDonald confiscated. The article further reported that plaintiff's badge was later revoked by then Sheriff Buncich. The article noted the similarities between plaintiff's encounter with Officer McDonald and her more recent encounter with Officer Gardenhire.

Even assuming that the paragraphs labeled "McDonald report and interview" in plaintiff's Statement of Genuine Issues constitute an attempt to survive summary

16

judgment as to the February 3rd article, they contain only one alleged fact relevant to the question of actual malice: that Kiesling did not contact the sheriff or prosecutor to investigate the accuracy of Officer McDonald's statements. However, "reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Shine v. Loomis*, 836 N.E.2d 952, 958-59 (Ind. Ct. App. 2005) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)). Plaintiff's allegations regarding defendant's failure to investigate is not sufficient to establish actual malice as to the February 3rd article.

### 3. February 6, 2003, editorial

On February 6, 2003, *The Times* published an editorial introduced by the following headline: "EDITORIAL – Credibility lacking in individual, organization." (Def.'s Ex. 18.) The editorial explained that plaintiff, a local anti-drug and alcohol abuse activist, was arrested for driving under the influence of alcohol. It also outlined plaintiff's encounter with Officer McDonald at the riverboat in May of 2002. The article called for judicious and limited issuance of honorary badges like the one plaintiff possessed at the time of the riverboat incident. Additionally, the article sought plaintiff's resignation and called for plaintiff to apologize to the two officers involved in the incidents, as well as the citizens of Lake County.

According to her brief, plaintiff takes issue with only one paragraph of the February 6th article: "The complained of language in this opinion is: 'Regardless of the outcome of her case, Filippo's alleged conduct, as related by the arresting officer and the state trooper, has effectively stripped her of any credibility to sit on the Partnership for a Drug Free Lake County. She should resign. She should apologize to the officers involved in the two documented incidents. She should apologize to the citizens of Lake County. She should seek professional help for herself, if need be.'" (Pl.'s Resp. 12.) Plaintiff claims that this statement "build[s] on and repeats previous reports of Filippo's alleged criminal misconduct (a defamation *per se*) as if [] they are true and requiring Filippo's apology/resignation." (Pl.'s Resp. 12.)

While it is defamatory *per se* to publish a false fact regarding the commission of a crime, it is not defamatory to publish the true fact of an arrest. *See Landry v. Duncan*, 902 So. 2d 1098, 1104 (La. App. 2005); *Drill Parts and Serv. Co., Inc. v. Joy Mfg. Co.*, 619 So. 2d 1280, 1290 (Ala. 1993). The article makes clear that plaintiff's case had not yet been resolved, even going so far as to state in the second paragraph: "It is important to note that while she has been arrested and charged, she has not been convicted." A reasonable reader would view defendant's February 6th article as a call for plaintiff's resignation based on the fact that she, a local community anti-drug activist, was arrested for driving under the influence of alcohol and because police reports and interviews with officers revealed that she twice acted cantankerously when dealing

18

with law enforcement. Such a publication does not constitute defamation *per se* as plaintiff asserts.

Even if the article did constitute defamation *per se*, plaintiff would still bear the burden of proving actual malice. *See Heeb,* 613 N.E.2d at 419. Plaintiff does not point to any evidence of actual malice regarding the February 6th article whatsoever. For this reason, her claim of defamation with regard to the February 6th article would also fail for lack of sufficient evidence of actual malice.

### 4. July 30, 2003, editorial and cartoon

On July 30, 2003, *The Times* published an editorial article and cartoon about plaintiff in its "Opinion" section. (Def.'s Ex. 24.) The editorial article stated that plaintiff had recently filed a defamation lawsuit against the agencies involved in her arrest. The editorial opined that it was plaintiff's behavior as outlined in the police report associated with her arrest, and not any action on the part of the arresting agencies, that was ruining her reputation. The editorial further insisted that plaintiff's lawsuit was only exacerbating her problems: "Her actions are perpetuating the story." The editorial was introduced by the following headline: "Another lawsuit in the works." A subheadline read: "The Issue: Lita Filippo. Our opinion: One way she can put this episode to rest is to let it go, drop it."

The cartoon accompanying the editorial depicted O.J. Simpson stating: "I'm still searching for the killer..." Plaintiff appears next to Simpson, holding a bottle and a steering wheel, declaring: "And I'm searching for the person responsible for putting me

in this mess!" Plaintiff also dons a button reading: "Just say whatever to drinking and driving."

In her response brief, plaintiff claims that the following language from the July 30th editorial constitutes defamation: "It was her lack of demeanor, as well as her title, that brought her the infamy she now says is defaming her . . . '[S]he should just apologize and get on with her life.' [Quoting the Lake County Sheriff spokesman.] Well said." Plaintiff argues that the editorial constitutes defamation *per se* because it makes reference to her unresolved criminal charge and endorses the idea that the allegations are true. (Pl.'s Resp. 13.)

Like the February 6th article, this editorial does not constitute defamation *per se* because there is no rule that speech regarding an individual's arrest is *per se* defamatory. No reasonable reader would find that the article stated or suggested that plaintiff was convicted of the crime of drinking while driving. Additionally, plaintiff presents no evidence that defendant published the editorial with actual malice.

As for the cartoon, plaintiff complains that it depicts her as having "a cavalier attitude toward drinking and driving." (Pl.'s Resp. 13.) Plaintiff points to her own affidavit as evidence that she possessed no such attitude, and claims that the cartoon conveys a false statement of fact.[3] Defendant, however, argues that the cartoon is a protected expression of the cartoonist's opinion.

_____

[3] In her affidavit, plaintiff states: "Any statement in the publications suggesting that I held a cavalier attitude toward drunken driving were false." (Pl.'s Ex. F ¶ 16.)

Under Indiana law, a statement that on first blush appears to constitute an "opinion" may still be legally defamatory if "a reasonable fact finder could conclude that the statement *implies facts* which may be proven true or false." *McQueen v. Fayette County Sch. Corp.*, 711 N.E.2d 62, 66 (Ind. Ct. App. 1999) (emphasis added); *United Consumers Club, Inc. v. Bledsoe,* 441 F. Supp. 2d 967, 980 (N.D. Ind. 2006) (test is whether content is objectively verifiable and, when read in context, would be understood as statement of fact by reasonable reader). As one Illinois court has noted, "in one sense all opinions imply facts." *Wynne v. Loyola Univ. of Chi.,* 741 N.E.2d 669, 676 (Ill. App. 2000). However, the legal test for determining whether a statement is a protected opinion does not depend simply whether the statement implies underlying "facts"– it depends on whether the statement implies *objectively verifiable or testable* facts. *Pope v. Chronicle Pub. Co.,* 95 F.3d 607, 614 (7th Cir. 1996) ("The important distinction is between subjective views of various kinds, on the one hand, and objectively verifiable or testable facts, on the other.").

Courts have repeatedly held that statements about another person's attitudes, beliefs, and personality traits constitute protected opinions. *Rambo v. Cohen,* 587 N.E.2d 140, 149 (Ind. Ct. App. 1992) (statement that plaintiff was "anti-Semitic" was protected opinion); *Lifton v. Bd. of Educ. of City of Chi.,* 416 F.3d 571, 579 (7th Cir. 2005) (Illinois law) ("lazy," "looking for sympathy," "unstable," "doesn't want to work"); *Hockycko v. Entrodyne Corp.,* No. Civ. A. 6:05CV00025, 2005 WL 3132320, at *7 (W.D. Va. Nov. 22, 2005) ("unwilling" to become involved and  "lacked desire" to learn); *Stevens v. Tillman,*

855 F.2d 394, 402 (7th Cir. 1988) (Illinois law) (accusations of "racism"); *Schivarelli v.*

*CBS, Inc.,* 776 N.E.2d 693, 698 (Ill. App. 2002) ("crook," "incompetent"); *Guilford Transp.*

*Indus., Inc. v. Wilner,* 760 A.2d 580, 598 (D.C. 2000) ("hostility" towards labor); *Raible v.*

*Newsweek, Inc.,* 341 F. Supp. 804, 809 (W.D. Pa. 1972) ("bigot"); *Fram v. Yellow Cab Co.,*

380 F. Supp. 1314 (W.D. Pa. 1974) (paranoid schizophrenic). As one court summarized,

"[d]efamatory statements are those which contain a provable fact, not subjective

conclusions about the Plaintiff's state of mind." *Hockycko,* 2005 WL 3132320, at *7.

In contrast, courts have held that false statements regarding a person's conduct

or performance are actionable, despite being couched in opinionated language. For

example, the statement that "[p]olice certainly have privileges, but I do not believe that

they should be abused in the way that some officers like Davidson have done" survived

the defendant's motion to dismiss because the statement "implie[d] verifiable facts

regarding Davidson's conduct and performance as a police officer." *Davidson v. Perron,*

716 N.E.2d 29, 37 (Ind. Ct. App. 1999). According to the court, "[a] reasonable trier of

fact could conclude the statement amounted to a charge of official misconduct against

Davidson . . . imputing to the reader that Davidson has abused his privileges as a police

officer." *Id.* In another case, the defendant stated that "you [McQueen] and your friends,

including Joe 'Doc' Heavey, have destroyed and undermined the girls' [basketball]

program . . . ." *McQueen v. Fayette County Sch. Corp.,* 711 N.E.2d 62, 64 (Ind. Ct. App.

1999). The court held that the statement was actionable, and not a protected opinion,

because it "implie[d] verifiable facts regarding McQueen's performance and conduct as the basketball scout and coach." *Id.* at 66.

The United States Supreme Court noted the difference between protected opinions and actionable expressions implying verifiable facts in *Milkovich v. Lorain Journal Co.,* 497 U.S. 1 (1990). The Court stated that calling someone a "liar" would constitute an actionable defamatory act, but commenting on someone's "abysmal ignorance" would constitute protected opinion. *Id.* at 20. According to the Court, the former could be proven false, while the latter could not. *Id.* at 19-20. The Seventh Circuit Court of Appeals echoed this logic in *Sullivan v. Conway* by explaining the difference between calling someone a "poor lawyer" and stating that a lawyer should be disbarred:

> It is one thing to say that a lawyer is dishonest, or has falsified his credentials, or has lost every case he has tried, or can never file suit within the statute of limitations. These are all readily verifiable statements of fact. But to say that he is a very poor lawyer is to express an opinion that is so difficult to verify or refute that it cannot feasibly be made a subject of inquiry by a jury. . . . If Conway had said that Sullivan had been or should be disbarred, this would be actionable (if false) because it would imply that Conway knew things about Sullivan that could be shown to be either true or false, since the grounds for disbarment are factual and not mere matters of subjective opinion or surmise.

157 F.3d 1092, 1097 (7th Cir. 1998).

Just as there is no way to confirm a person's abysmal ignorance or racist viewpoints, there is no way to objectively verify or test the truth or falsity of whether plaintiff possessed a cavalier attitude toward drinking and driving. Indeed, the only

way to verify plaintiff's attitude is through plaintiff's own testimony, which is

intrinsically and necessarily *sub*jective. *Uhler v. Galesi Mgmt. Corp.*, No. Civ. A.

3:98-CV-0005-L, 1999 WL 20949, at *8 (N.D. Tex. Jan. 8, 1999) ("If Uhler intentionally

'faked' an accident in order to 'scam' Galesi, only Uhler would know. . . . [T]hey are

nothing more than expressions of opinion which are not objectively verifiable. Such

statements of opinion cannot be the subject of a slander claim."). In sum, even if the July

30th cartoon could be construed as conveying the idea that plaintiff possessed a cavalier

attitude towards drinking and driving as plaintiff argues, that attitude is simply not an

objectively verifiable fact. *See Keller v. Miami Herald Pub. Co.*, 778 F.2d 711, 718 (11th Cir.

1985) (cartoon implying that nursing home manager was reaping profits at residents'

expense was protected opinion because "ordinarily, an individual's morality or

immorality is not subject to empirical proof"). Defendant's July 30th cartoon constitutes

a protected expression of opinion and cannot support plaintiff's claim of defamation.

Plaintiff does not argue outright that the cartoon is defamatory because it

conveys the underlying false fact that she was convicted of drunk driving. However, to

the extent that her response can be construed as containing such an argument, the

argument is rejected. A segment of a publication may not be read in isolation, but must

be viewed with the whole publication in determining whether the publication

constitutes defamation. *Hamilton v. Prewett*, 860 N.E.2d 1234, 1246-47 (Ind. Ct. App.

2007) (defamatory nature of website must be determined by examining site as whole,

not isolated page or sentence). As explained above, the article accompanying the

cartoon and appearing on the same "Opinion" page of the July 30, 2003, issue of *The Times* made clear that plaintiff was only arrested (a fact that plaintiff does not dispute is true) and could not reasonably be construed as implying that plaintiff was convicted of the criminal offense of driving under the influence of alcohol. Accordingly, had plaintiff argued that the cartoon implied that she was guilty of committing the offense, the argument would fail.

## IV. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment (docket # 33) is **GRANTED**. Defendant's motion for oral argument (docket # 36) and motion to strike (docket # 48) are **DENIED** as moot.

Defendant's motion briefly requests attorney's fees under the Indiana "anti-SLAPP" statute. IND. CODE 34-7-7-7 (2007). The court **ORDERS** that defendant file a memorandum on the issue of its legal entitlement to attorney's fees by **May 9, 2007**. Plaintiff's response is due by May 23, 2007; defendant's reply, if any, is due by May 30, 2007. The parties are to limit these filings to ten (10) pages each. The court withholds entering final judgment in this case until this issue is resolved.

**SO ORDERED.**

**ENTER:** April 30, 2007

s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT